## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Luana Pecore,

                Plaintiff,

v.

Jennie-O Turkey Store, Inc.,

                Defendant.

Civ. No. 13-1676 (RHK/HB)
**MEMORANDUM OPINION
AND ORDER**

---

Bonnie N. Smith, Matthew H. Morgan, Janet M. Olawsky, Nichols Kaster, PLLP, Minneapolis, Minnesota, for Plaintiff.

Ryan E. Mick, Jillian Kornblatt, Jessie Erin Rosenthal Mischke, Dorsey & Whitney LLP, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

Plaintiff Luana Pecore previously worked for Defendant Jennie-O Turkey Store, Inc. ("Jennie-O") as the manager of its Hidden Valley turkey farm in Faribault, Minnesota. After Jennie-O terminated her employment in 2012, she commenced this action alleging that it had discriminated against her on account of her sex, and subjected her to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minnesota Statutes § 363A.01 *et seq.* She also alleged that Jennie-O had retaliated against her for complaining about mistreatment and had violated the Minnesota Occupational Safety and Health Act ("MOSHA"), Minn. Stat. § 182.65 *et seq.*, and the

Minnesota Whistleblower Act ("MWA"), Minn. Stat. § 181.931 *et seq*.  Presently before the Court is Jennie-O's Motion for Summary Judgment.  For the reasons that follow, the Motion will be granted in part, the Title VII and MHRA claims will be dismissed, and the Court will decline to exercise supplemental jurisdiction over the remaining claims.

## BACKGROUND

Viewed in the light most favorable to Pecore, the record reveals the following facts.  Jennie-O is a leading producer and processor of turkeys.  It hired Pecore as an assistant farm manager at its Hidden Valley farm in 2004; she was promoted to farm manager later that year.  In that role, she lived on the farm and was responsible for the care of Jennie-O's turkeys, which ranged in age from just hatched (a "poult") to seven weeks old.  At all pertinent times, Pecore's immediate supervisor was Danny Thomas.

Generally speaking, Pecore performed her job well; she took good care of her turkeys and received high "livability" scores, that is, the percentage of poults that survived to adulthood.  Thomas noted some concerns with her performance, however, including high production costs (particularly with regard to the use of fuel).  Indeed, Pecore recognized in an (undated) self-evaluation that she "tr[ied] very hard, but miss[ed] some things" and "need[ed] improvement," especially with regard to fuel usage.

Though she had been a good employee for several years, things changed in 2012 after Jennie-O began to focus more stringently on the costs of turkey production.  Managers were required to assist on other farms and could no longer stop working for the day after completing chores on their own farms.  Around this time, Pecore's performance started to decline, resulting in increased counseling from Thomas.  In addition, Ryan

Brunner, Hidden Valley's assistant manager, felt Pecore's work ethic waned, requiring him to pick up the slack.

Meanwhile, Pecore learned in April 2012 that Jennie-O workers on a different farm (Deerfield) had been burned with BioCres 50, a cleaning agent used to sanitize the farm's water lines. When Thomas informed Pecore that BioCres 50 might be used at Hidden Valley, she requested a Material Safety Data Sheet ("MDS Sheet")[1] for the chemical, as well as protective gear. Thomas failed to respond to Pecore's request, and hence she bought the protective gear on her own using a company credit card. When Thomas learned of the purchase, however, he yelled that she could not keep the gear because every employee would want it. Ultimately, he allowed her to keep the gear but threatened that his supervisor, Steven Houzenga, had instructed Thomas to "write [her] up to teach [her] a lesson."

Over the ensuing weeks, Pecore continually requested MDS Sheets for BioCres 50 and another cleaning chemical, DC&R,[2] but never received them. In addition, Thomas (allegedly) assigned her to work in the Hidden Valley barn approximately 20 times while DC&R was being used. By late May 2012, Pecore asked to meet with Shirley Drentlaw, Jennie-O's human resources (HR) manager, to discuss the chemicals used at the farm. Thomas reacted angrily, asking Pecore why she had involved HR. Ultimately, Pecore, Thomas, and Drentlaw met on June 11, 2012, to discuss Pecore's concerns.

---

[1] "Employers shall have a safety data sheet in the workplace for each hazardous chemical which they use." 29 C.F.R. § 1910.1200(g)(1).

[2] DC&R is a disinfectant sprayed as a fog in the barns on Jennie-O's farms.

According to Pecore, Thomas's hostility escalated over the ensuing months.  For example, on July 19, 2012, she received a written warning for not being at the farm during assigned working hours (7:00 am to 3:00 pm).  She claims she had finished her chores by mid-morning and had left to run "personal errands" when Thomas called and asked her to spray the barns with water (as it was a hot day).  Though she does not dispute having left early, she claims Thomas "completely fabricated" the reasons for the warning because farm managers were "almost always allowed to leave . . . after completing their chores."  For the remainder of her employment, Thomas directed her to check on her barns every two hours and would call her several times a day to ensure she had done so and had completed her other duties, actions he did not undertake with other managers.

Pecore also points to an incident in August 2012 in which Thomas commented on her attire.  On a hot summer day, Pecore wore a sleeveless t-shirt without wearing a bra.  She was unconcerned that others could see through the open sleeve holes, as she had undergone a double mastectomy for breast cancer and, in her words, "ha[d] nothing" for anyone to see.  Moreover, male employees frequently worked shirtless on hot days.  Nevertheless, after several male employees "giggled," Thomas commented that she should change her clothing because "[n]obody should have to look at something like that."  Pecore felt humiliated by this comment.

Pecore also claims Thomas treated her less favorably than male farm managers and other employees.  She asserts, for instance, that he repeatedly yelled at her that it was "his way or the highway"; did not permit her grandson to ride on farm equipment, when

the grandchildren of male managers were allowed to do so; and told her to "pull it up" when he found her urinating outside.[3]  She also claims Thomas gave her more work than male managers but offered her less help to complete it, including frequently reassigning Brunner to work on other farms so he could not assist Pecore.  He also altered her working hours, making it difficult to pick up her grandson from school.[4]

Pecore eventually complained to Drentlaw about Thomas's treatment.  She asserted she was being "singled out" because she was female and complained Thomas had admitted "sabotaging" a former female farm manager (Trish Swenson) by "piling" her turkeys[5] in order to get her fired, and she expressed concern Thomas would do the same to her.  She also expressed fear that Thomas would retaliate against her for speaking to HR.  Drentlaw denied Thomas had sabotaged anyone and told Pecore he was likely "just trying to be a big shot," and she took no further action in response to the complaints.  A short time later, Thomas met with Pecore and "counseled" her regarding the number of sick days she had taken in 2012.  On the way out of the meeting, he informed her that he

---

[3] It was common practice for Hidden Valley employees (male and female) to urinate outside, because the farm's outhouse was "disgusting" and infested with hornets.

[4] In her brief, Pecore claims Brunner told her Thomas was biased against women and "if you were a guy, Thomas would never treat you like that."  The Court has carefully reviewed the cited portions of Brunner's deposition, however, and finds no support for these allegations.  Brunner repeatedly denied making the statements; at most, on a handful of occasions he simply could not recall whether he had made similar remarks.

[5] As poults age, they are gradually given additional room to roam by use of a "brood guard," a removable cardboard fence that encircles them.  For the first ten days of their lives, the brood guard is slowly expanded outward, and on the tenth day it is completely removed in a process known as "releasing."  If the brood guard falls down before the tenth day, it can create an obstruction causing the poults to literally "pile" on top of each other, suffocating those at the bottom of the pile.

knew she had spoken with Drentlaw, and he told her to only go through him (the "chain of command") in the future.  Nevertheless, Pecore reiterated her complaints to Drentlaw in a subsequent telephone call and requested a new supervisor, but no change came.

In October 2012, Pecore took a pre-planned vacation.  On the day of her departure, a Jennie-O veterinarian visited Hidden Valley and noted a significant number of concerns, which she relayed to Thomas.  When Pecore returned to work on November 1, 2012, she had a voicemail from Thomas ordering her and Brunner to attend a meeting with him and Pat Madden from HR later that same day.  According to Pecore, she immediately called Thomas and asked that Drentlaw be present at the meeting, and Thomas informed her the meeting would be rescheduled when Drentlaw was available.  Nevertheless, the meeting went forward as planned, without Pecore in attendance.[6]  Thomas then suspended her for three days without pay, for "refus[ing] to attend a mandatory meeting."  Pecore complained to Drentlaw, who (allegedly) informed her that she had no right to request specific HR personnel at a meeting and could not "second guess" Thomas.

Pecore did not work the weekend of December 8-9, 2012.  Sometime during the evening on Sunday, December 9, a brood guard fell in one of the farm's barns, causing nearly 1000 turkeys to pile.  Pecore discovered the pile when she returned to the farm on the morning of December 10.  She disposed of as many dead birds as she could before

---

[6] Pecore testified in her deposition that Brunner overheard the conversation in which Thomas said he would reschedule the meeting.  Yet, Brunner testified he did not recall such a conversation, and he actually attended the meeting as scheduled.

traveling to a different farm (Valley View) where Thomas had assigned her to work.  She did not report the pile at that time.

Later that morning, Pecore overheard Brunner, who also was working at Valley View, discussing work schedules with Thomas by telephone.  Pecore asked to speak with Thomas; when she got on the phone, Thomas mentioned she would not be able to pick up her grandson because of work he would require her to complete that day.  Pecore (admittedly) became extremely upset and asked Thomas whether the rest of the farm managers were treated in the same fashion or if she was the "chosen one."  Thomas immediately replied that Pecore was "going to HR" and scheduled a meeting with Drentlaw and Madden for later that day.

According to Drentlaw, when Pecore arrived at that meeting, she immediately began screaming and swearing and demanded her "termination papers."[7]  Pecore denies demanding termination but admits she was "upset" and "crying" and expressed that she "dreaded" getting out of bed to come to work.  She reiterated her complaints about Thomas and, according to Drentlaw, began berating him; Drentlaw attempted to steer the conversation to the performance issues raised by Thomas.  At this point, Pecore mentioned that hundreds of turkeys had piled overnight at Hidden Valley.  Thomas asked why she had not immediately reported the pile, and Pecore told him she had not thought to – though she knew she was required to – because she was "overwhelmed" and had "so

---

[7] Madden prepared notes of the meeting that differ diametrically from Pecore's account; in her deposition, she deemed the notes largely "lie[s], lie[s], lie[s]."

much on [her] mind" because Thomas was "stress[ing]" her out.  Drentlaw then decided to suspend Pecore pending a "review" of her performance, including the bird pile.

Drentlaw later spoke by telephone with Steve Williams, Jennie-O's director of employee relations.  Together they discussed Pecore's performance and the events of December 10, including her conduct at the meeting and the failure to immediately report the bird pile; this included reviewing Pecore's employment file containing Thomas's prior discipline.  Williams concluded that in light of Pecore's comments at the meeting, her failure to promptly report the bird pile, and her recent performance, she could no longer be trusted to care for Jennie-O's turkeys and terminated her employment.  The reason provided in her termination letter was "insubordination" for "not following [the] instructions" of her supervisor.  In Pecore's place, Jennie-O hired Melissa Karsten, another female, to manage the Hidden Valley farm.

After exhausting administrative remedies, Pecore commenced the instant action on June 27, 2013.  Her Complaint alleges that Jennie-O's conduct constituted sex discrimination and retaliation, and subjected her to a hostile work environment, in violation of Title VII and the MHRA.  She also alleges that Jennie-O violated the MOSHA and MWA by retaliating against her for complaining about the chemicals used at Hidden Valley.  With discovery complete, Jennie-O now moves for summary judgment.  The Motion has been fully briefed, the Court heart oral argument on July 23, 2014, and the Motion is ripe for disposition.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*);[8] Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Beard v. Banks, 548 U.S 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

### I.  Sex discrimination

Both Title VII and the MHRA prohibit discrimination in employment on the basis of sex.  E.g., Wierman v. Casey's Gen. Stores, 638 F.3d 984, 993 (8th Cir. 2011); Hervey v. Cnty. of Koochiching, 527 F.3d 711, 719 (8th Cir. 2008).  Claims under the two

---

[8] Several Eighth Circuit cases cited here have a "red flag" on Westlaw as a result of Torgerson, which abrogated a litany of decisions suggesting summary judgment should be granted sparingly in discrimination cases.  Because this Court has cited the cases for different legal principles that remain good law, it has not indicated such abrogation.

statutes generally are analyzed in the same fashion.  E.g., Guimaraes v. SuperValu, Inc., 674 F.3d 962, 972 (8th Cir. 2012).  A plaintiff alleging sex discrimination may survive a motion for summary judgment either by presenting "direct evidence" of discrimination or by utilizing the McDonnell Douglas[9] burden-shifting framework.  E.g., McGinnis v. Union Pac. R.R., 496 F.3d 868, 873 (8th Cir. 2007).  In the absence of "direct evidence" here, which Pecore does not allege, the Court analyzes her discrimination claims under McDonnell Douglas.

The McDonnell Douglas framework proceeds in three steps.  First, the plaintiff must establish a prima facie case of discrimination, which requires her to show she (1) is within a protected class, (2) was qualified to perform her job, (3) suffered an adverse employment action, and (4) "has facts that give rise to an inference of discrimination." Id. at 874; accord, e.g., Norman v. Union Pac. R.R. Co., 606 F.3d 455, 461 (8th Cir. 2010).  If she does so, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its conduct.  McGinnis, 496 F.3d at 873.  The plaintiff must then show the proffered reason is a pretext for discrimination.  Id.

It is undisputed here that Pecore is a member of a protected class (female) and was qualified to perform her job as farm manager.  For adverse employment actions, she points to her three-day suspension in November 2012 and her termination one month later; each qualifies as sufficiently adverse.  See, e.g., Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007) (adverse employment action is one that "produces a material

---

[9] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

employment disadvantage," including "[t]ermination" and "cuts in pay or benefits").[10]

Accordingly, Pecore has established the first three prongs of the prima facie case.

The Court questions, however, whether Pecore has met the fourth prong, because she has (at best) only weak evidence "giv[ing] rise to an inference of discrimination." McGinnis, 496 F.3d at 874.  Claiming "[t]he record is full of evidence demonstrating that [her] sex was a factor in" her suspension and termination, Pecore offers several examples of alleged gender bias, but most leave the Court wanting.  (Mem. in Opp'n at 40.)  For instance, Pecore points to the fact Thomas made a "demeaning" comment about her mastectomy scars.  Yet, there is no evidence this comment (assuming it occurred) was made because of Pecore's *sex*, rather than because of *the fact of the scars themselves*. Pecore similarly asserts that Thomas "violated her privacy" by telling her to "pull it up" while urinating outside, but there is nothing connecting that comment to Pecore's sex. And though Pecore claims Thomas once said "what can I expect out of a woman?", such "stray remarks," not directly connected to the suspension and termination decisions, "are insufficient to establish discrimination."  Kunzman v. Enron Corp., 902 F. Supp. 882, 899 (N.D. Iowa 1995) (citing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)); see also, e.g. Linville v. Sears, Roebuck & Co., 335 F.3d 822, 824 (8th Cir. 2003) (*per curiam*) ("crude, gender-specific vulgarity . . . was not, by itself, probative of gender

---

[10] Pecore also asserts she suffered adverse employment actions when Thomas changed her work schedule, added responsibilities, and gave her less help than her co-workers.  (Mem. in Opp'n at 40.)  These are not adverse employment actions.  See, e.g., Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 927 (8th Cir. 2007) (denial of training, poor evaluation, not being given tools to be productive, and alteration of duties, both individually and cumulatively, were not adverse; "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not rise to the level of an adverse employment action.").

discrimination"). While the record indicates the relationship between Pecore and Thomas eroded as 2012 wore on, the evidence is meager it did so because of gender bias. As in Hervey, an inference of discrimination does not arise simply because Pecore has "recite[d] a list of actions [Thomas] took against her, and claim[ed] they were taken because she is a woman." 527 F.3d at 722.

Regardless, assuming *arguendo* Pecore has established a prima facie of sex discrimination, Jennie-O has proffered legitimate, nondiscriminatory reasons for its conduct: Pecore's failure to attend a mandatory meeting, which resulted in her suspension, and her insubordination (including talking back to Thomas), her conduct at the December 10 meeting, her ongoing performance problems, and her failure to report the bird pile, which resulted in her termination. Accordingly, she must show these reasons are mere pretexts for discrimination. To do so, she can either (1) show Jennie-O's reasons are "unworthy of credence . . . because [they] ha[ve] no basis in fact" or (2) "persuad[e] the court that a [prohibited] reason more likely motivated" Jennie-O. Torgerson, 643 F.3d at 1047; accord Fiero v. CSG Sys., Inc., __ F.3d __, 2014 WL 3511780, at *3 (8th Cir. July 17, 2014). She can do neither.

First, Pecore cannot show Jennie-O's proffered reasons have no basis in fact. Indeed, it is *undisputed* Pecore missed the November 1, 2012 meeting with Thomas. Although she claims Thomas told her that he would reschedule the meeting, she also testified in her deposition that Brunner overheard her conversation with Thomas, and it is undisputed Brunner actually attended the meeting *as originally scheduled*. If Brunner knew the meeting was to be rescheduled, as Pecore claims, why would he have been in

attendance at the originally scheduled time?  The facts simply do not suffice to create a genuine issue the proffered reason for the suspension is unworthy of credence.  Similarly, Pecore cannot show the given reasons for her termination were false.  Although she disputes some of what happened on December 10, she acknowledges (1) failing to immediately report the bird pile, (2) talking back to Thomas and complaining he was treating her differently than others, and then, at the meeting, (3) expressing difficulty getting out of bed to come to work and (4) being "upset" and "crying."  The reasons offered by Jennie-O are consistent with the undisputed evidence in the record.

By the same token, the evidence here does not "persuad[e] the court that a [prohibited] reason more likely motivated" Jennie-O.  Torgerson, 643 F.3d at 1047.  A plaintiff may make such a showing by proffering evidence that she "received a favorable review shortly before [the adverse action], that similarly situated employees . . . were treated more leniently, that the employer changed its explanation for [its conduct], or that the employer deviated from its policies."  Ebersole v. Novo Nordisk, Inc., __ F.3d __, 2014 WL 3361160, at *5 (8th Cir. July 10, 2014).  Pecore makes little attempt to show these things with respect to her suspension, choosing instead to focus on her termination. (See Mem. in Opp'n at 34-36.)  Even then, the evidence does not militate in her favor.

Pecore contends, for example, that no written policy required her to immediately report the bird pile, but she acknowledged in her deposition that it "was definitely something that needed to be reported."  She argues that her conduct on December 10 was not mentioned in her termination letter and, accordingly, that Jennie-O has shifted its reasons for her discharge, but the letter specifically noted she had been fired for

"insubordination to following [s]upervisor['s] instructions" – hardly inconsistent with the

undisputed facts of talking back to Thomas and then acting out in the December 10

meeting. See also, e.g., Wierman, 638 F.3d at 1001 (shifting explanations may suggest

pretext, but "supplementing" the explanation for an employee's discharge by offering

additional, not inconsistent, reasons does not). She contends Jennie-O did not conduct an

investigation into the cause of the bird pile, but she points to no evidence indicating such

an investigation was normal policy, cf. Erickson v. Farmland Indus., Inc., 271 F.3d 718,

727 (8th Cir. 2001) (employee can prove pretext with evidence employer varied from its

policies or practices), and in any event, "the appropriate scope of an internal investigation

. . . is a business judgment, and [the Court does] not review the rationale behind such a

decision," Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir.

2012). And, she asserts that her performance had never been questioned until she began

complaining about Thomas's treatment, but the record does not support that contention,

as Pecore's annual reviews repeatedly documented high fuel and production costs and the

need to improve on finishing tasks in a timely fashion – shortcomings that Pecore herself

acknowledged in her self-evaluation. In the Court's view, the record as a whole simply

does not create a genuine issue that Jennie-O was motivated by Pecore's sex when it

terminated her employment.[11]

---

[11] With respect to her discharge, Jennie-O offers a different reason why Pecore cannot show discrimination: Williams made the termination decision, and there is no evidence of bias on his part. But Thomas testified in his deposition that he recommended Pecore's termination, and it was Thomas who (allegedly) "papered" the file Williams reviewed before deciding to end Pecore's employment. These facts belie Jennie-O's argument. See, e.g., Stacks v. Sw. Bell Yellow Pages, Inc., 27 F.3d 1316, 1323 (8th Cir. 1994) (bias of individual who "was closely

## II.     Hostile work environment

Pecore next claims Thomas's repeated "harassment" subjected her to a hostile

work environment.  "Title VII's prohibition of discrimination in employment on the basis

of sex . . . includes sexual harassment, which 'has the purpose or effect of unreasonably

interfering with an individual's work performance or creating an intimidating, hostile, or

offensive work environment.'"  Sheriff v. Midwest Health Partners, P.C., 619 F.3d 923,

929 (8th Cir. 2010) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-66

(1986)).[12]  A hostile work environment exists when the plaintiff's workplace is so

permeated with "discriminatory intimidation, ridicule, and insult" that her working

conditions are altered and the work environment is "abusive."  Smith v. Fairview Ridges

Hosp., 625 F.3d 1076, 1083 (8th Cir. 2010).  This is evaluated both objectively and

subjectively.  Id.  That is, the plaintiff must show a working environment "that a

reasonable person would find hostile or abusive, *and* one that [she] in fact did perceive to

be so."  Id. (emphasis added) (citation omitted).  Here, Pecore claims she was subjected

to a campaign of unwelcome sexual harassment by Thomas, but in the Court's view her

claim falters for two independent reasons.

---

involved in the decision-making process" was critical; "[t]hat [he] did not pull the trigger is of
little consequence") (internal quotation marks and citation omitted); see also, e.g., Bennett v.
Riceland Foods, Inc., 721 F.3d 546, 551 (8th Cir. 2013) (under the "cat's paw" theory, "an
employer may be vicariously liable for an adverse employment action if one of its agents – other
than the ultimate decision maker – is motivated by discriminatory animus and intentionally and
proximately causes the action").

[12] The MHRA also prevents an employer from subjecting an employee to a sexually hostile work
environment.  E.g., LaMont v. Indep. Sch. Dist. No. 728, 814 N.W.2d 14,19-20 (Minn. 2012).
MHRA hostile-work-environment claims are evaluated in the same fashion as those under Title
VII.  Id. at 22-23.

First, a plaintiff asserting a hostile work environment must proffer sufficient

evidence the harassment was *due to the plaintiff's sex*.  E.g., Linville, 335 F.3d at 824.

But as discussed above, little evidence in the record here suggests Thomas's actions

toward Pecore were predicated on gender bias.  The fact that Pecore's relationship with

Thomas soured in 2012 does not automatically imply it did so because of her sex; indeed,

the two worked together for several years without problem, and Pecore testified in her

deposition that Thomas was "real[ly] nice to" her at the beginning of their relationship.

Moreover, the Court finds it noteworthy Pecore was replaced at Hidden Valley with

another female, who reports no problems working with Thomas and who has lowered the

production expenses that plagued Pecore.  See, e.g., Walker v. St. Anthony's Med. Ctr.,

881 F.2d 554, 558 (8th Cir. 1989) ("Certainly, if a woman alleging sex discrimination is

replaced by a female, this fact is relevant in evaluating the employer's motive.").[13]

Second, "[h]ostile work environment claims are limited in nature, requiring a high

evidentiary showing that the plaintiff's workplace is 'permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment.'"

Vajdl v. Mesabi Acad. of KidsPeace, Inc., 484 F.3d 546, 550 (8th Cir. 2007) (citation

omitted).  Pecore asserts Thomas "berated her, called her multiple times a day to the

point where she dreaded answering the phone, made humiliating and degrading

comments to and about her, invaded her privacy, threatened to paper her personnel file

---

[13] Pecore contends Thomas acknowledged doing everything he could – including intentionally
causing a bird pile – to "get rid of" Swenson; Thomas denies this.  But even if true, the record
does not suggest Thomas intended to get Swenson fired *because of her sex*.

and fire her, and made extremely offensive comments about her chest." (Mem. in Opp'n

at 42-43.) While she undoubtedly felt harassed by this conduct, in its totality it does not,

in the Court's view, satisfy the demanding *objective* standard for a hostile-work-

environment claim.

Duncan v. General Motors Corp., 300 F.3d 928 (8th Cir. 2002), is instructive.

There, over a period of three years, the plaintiff's alleged harasser repeatedly petted her

hand; told her he wanted to have a relationship with her; requested that she make a sketch

of a planter, shaped like a slouched man with a hole in the front of his pants that allowed

for a cactus to protrude; put up a poster portraying the plaintiff as president of "Man

Hater's Club of America"; requested that she type a draft of beliefs of "He-Men Women

Hater's Club"; required her to use a computer with a screen saver displaying a picture of

a naked woman; kept a penis-shaped pacifier in his desk, which he showed the plaintiff;

and forced the plaintiff to go with him to a bar. Id. at 931-34. Despite this barrage, the

Eighth Circuit held that the plaintiff had failed to demonstrate conduct so severe or

pervasive as to create a hostile work environment.

So too here. Though she claims the harassment continued unabated for the

entirety of Thomas's tenure as her supervisor, most of the challenged conduct – including

calling her multiple times a day, "invading her privacy" in connection with her urination,

threatening to "paper" her file or terminate her employment, and making comments about

her scars – occurred during only the last few months of her employment. Vajdl, 484 F.3d

at 552 (fact that challenged conduct "occurred mostly within a three-month window"

undermined assertion of hostile work environment). There is no evidence in the record

indicating Thomas ever made physically threatening statements to Pecore; nor were most of his comments overtly sexual in nature.  Id.  Indeed, little of the challenged conduct bears any direct nexus to Pecore's sex, as opposed to simply rude or unprofessional behavior.  "[C]onduct must be *extreme* and not merely rude or unpleasant" to cross the line.  Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 420 (8th Cir. 2010) (emphasis added) (citation omitted) (no hostile work environment where plaintiff was the target of sexually explicit jokes, solicited for sex, subjected to comments about the size of her breasts, and was physically accosted on several occasions).  In this Court's view, the totality of the circumstances here does not show conduct sufficiently severe or pervasive to constitute a hostile work environment.[14]

## III.   Retaliation

Both Title VII and the MHRA prohibit an employer from taking materially adverse action against an employee who engages in protected conduct.  E.g, Pye v. Nu Aire, Inc., 641 F.3d 1011, 1020 (8th Cir. 2011).[15]  Pecore claims Jennie-O retaliated against her for complaining about Thomas's conduct, but in the Court's view this claim fails.

---

[14] Pecore asserts that when she telephoned Drentlaw to request a new supervisor, Drentlaw told her that Thomas was "harassing [her] and it has to end."  Drentlaw denies the statement.  But even if made, it is not dispositive of Pecore's claim, because her work environment was not *objectively* hostile.

[15] The MHRA uses the term "reprisal" rather than "retaliation," but otherwise such claims are analyzed in the same fashion.  Colenburg v. STARCON Int'l, Inc., 656 F. Supp. 2d 947, 956 n.7 (D. Minn. 2009) (Kyle, J.), aff'd, 619 F.3d 986 (8th Cir. 2010).  For ease of reference, the Court refers to both claims here as alleging "retaliation."

## A.      What conduct is actionable?

At the outset, it is important to recognize that certain conduct challenged by Pecore is not actionable as retaliation.  In order to succeed on a retaliation claim, a plaintiff must show her employer took action against her "harmful enough that a reasonable employee would find it materially adverse."  Young-Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 912 (8th Cir. 2011).  "Materially adverse" means conduct that might dissuade a reasonable worker from engaging in protected conduct.  Id. While this may sound like a low threshold, it nevertheless does not encompass all matters an employee might dislike.

For example, in Devin v. Schwan's Home Service, Inc., 491 F.3d 778 (8th Cir. 2007), the plaintiff alleged that her employer failed to provide her with a "Route Builder," a tool she needed to grow her sales, in response to her complaints about gender discrimination.  Though the record showed that having a Route Builder increased sales, the Eighth Circuit rejected the plaintiff's retaliation claim because she failed to show "the denial of a Route Builder produced *significant* harm."  Id. at 786 (emphasis added). Similarly, in Fercello v. County of Ramsey, 612 F.3d 1069 (8th Cir. 2010), the plaintiff contended that her parking space was moved and her office relocated in response to her complaints about harassment.  The Eighth Circuit concluded that neither was a materially adverse action upon which a retaliation claim could be based.  Id. at 1078-79; see also Ewald v. Royal Norwegian Embassy, __ F. Supp. 2d __, 2014 WL 896726, at *14 (D. Minn. Mar. 6, 2014) (Nelson, J.) (denial of reimbursement for travel, reprimands,

perceived threats, comments about plaintiff's performance, and exclusion from work-related events not materially adverse).

Here, much of the conduct Pecore challenges, including the assignment of more work (with less help), the alteration of her working hours, and the "counseling" and "warnings" she received in October and November, are not materially adverse.  See, e.g., AuBuchon v. Geithner, 743 F.3d 638, 645 (8th Cir. 2014) (accelerating work deadlines and assigning extra work were "petty slights or minor annoyances" not amounting to actionable retaliation); Recio v. Creighton Univ., 521 F.3d 934, 940 (8th Cir. 2008) (requiring plaintiff to work on Monday, Wednesday, and Friday rather than her preferred Tuesday-through-Thursday schedule was not materially adverse).  Rather, only her suspension and termination are sufficiently adverse to support her retaliation claims.

### B.      Direct vs. indirect evidence

As with a discrimination claim, a plaintiff alleging retaliation can overcome summary judgment with either direct evidence of retaliation or through the indirect McDonnell Douglas method.  Pecore first asserts that she possesses direct evidence of retaliation in this case, but the Court disagrees.

Direct evidence of retaliation is evidence demonstrating "a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct."  Young-Losee, 631 F.3d at 912.  Here, Pecore points to the following as direct evidence of retaliation:  Thomas admonishing her to "following the chain of command" and bring her concerns to him rather than HR, and Thomas telling her it was "his way or

the highway." (Mem. in Opp'n at 32-33.) Neither shows a specific link between

Pecore's suspension or termination and her complaints. Accordingly, neither constitutes

direct evidence of retaliation.[16]

In the absence of direct evidence, therefore, Pecore must utilize the McDonnell

Douglas framework in order to survive summary judgment. As with her discrimination

claims, this requires her to establish a prima facie case of retaliation, after which the

burden shifts to Jennie-O to articulate a legitimate, non-retaliatory reason for its conduct.

If it does so, the burden returns to Pecore to show that Jennie-O's proffered reason was

pretextual. E.g., Wood, 705 F.3d at 829.

The Court will assume *arguendo* that Pecore has stated a prima facie case of

retaliation in connection with her suspension and termination. Nevertheless, the claim

fails. As discussed above, Jennie-O has proffered legitimate reasons for each of these

---

[16] Pecore additionally claims that a handful of comments and other actions occurring after she raised questions about BioCres 50 and DC&R constitute direct evidence. But these cannot support her *Title VII* and *MHRA* retaliation claims, because complaining about chemicals is not "protected conduct" under those statutes. See Hervey, 527 F.3d at 722 (protected conduct is "oppos[ing] any practice *made unlawful by Title VII*, or ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding or hearing *under the statute*") (emphasis added). In other words, because these complaints did not implicate Pecore's sex, any alleged "retaliation" in response to them would not constitute direct evidence of a Title VII or MHRA violation.

Pecore also claims Thomas threatened to charge rent for her Jennie-O housing when she discussed taking medical leave for shingles in October 2012. There is some evidence in the record this matter was indeed discussed, although that evidence is unclear and suggests the issue likely arose in response to the possibility Pecore would be classified as less than a full-time employee. (Her rental agreement provided she would live at Hidden Valley rent-free as long as she remained a full-time employee.) Regardless, it is undisputed she was not actually charged rent during her employment, and hence these discussions constitute neither an adverse employment action nor direct evidence of retaliation.

And, at oral argument, Pecore cited as direct evidence a comment by Drentlaw when Pecore asked for a new supervisor: Drentlaw's (purported) response that Pecore was "really put[ting] her in the middle." As this comment did not relate to Pecore's suspension or termination, however, it is not direct evidence.

actions, and to show pretext, Pecore points to the same evidence offered above with
respect to discrimination, which the Court has already rejected.  (See supra at 13-14.)
Accordingly, the retaliation claims fail for the same reason the discrimination claims fail.
See Wierman, 638 F.3d at 1001 (retaliation claim arising out of plaintiff's termination
failed for "the same reasons her . . . discrimination case failed—a lack of sufficient
evidence to cast doubt on [the proffered] reason for terminating [her]").

## IV.     The remaining claims

For all of the foregoing reasons, Pecore's Title VII and MHRA claims fail.  Yet,
the Court's subject-matter jurisdiction in this action is premised on the existence of a
federal claim – namely, the Title VII claim.  (See Compl. ¶ 3.)  Jurisdiction over the
state-law claims exists solely by virtue of the supplemental-jurisdiction statute, 28 U.S.C.
§ 1367, which provides jurisdiction over state-law claims forming part of the same "case
or controversy" as federal claims.  (Id. ¶ 4.)  But the exercise of supplemental jurisdiction
is discretionary, and where all federal claims have been dismissed prior to trial, the
factors to be considered in deciding whether to exercise such jurisdiction – judicial
economy, convenience, fairness, comity, and predominance of state issues – typically
militate against doing so.  E.g., Johnson v. City of Shorewood, Minn., 360 F.3d 810, 819
(8th Cir. 2004) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988));
accord, e.g., United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the
federal claims are dismissed before trial, even though not insubstantial in a jurisdictional
sense, the state claims should be dismissed as well.").  That is the case here.
Accordingly, the Court declines to exercise supplemental jurisdiction over Pecore's

remaining state-law claims (under the MOSHA and MWA), and it will dismiss those claims without prejudice.

It might seem incongruous for the Court to exercise supplemental jurisdiction over the MHRA claims and dismiss those claims on the merits while at the same time declining to exercise supplemental jurisdiction over the remaining state-law claims.  This is permissible, however.  <u>See, e.g.</u>, <u>Rau v. Roberts</u>, Civ. No. 08-2451, 2010 WL 396223, at *8 (D. Minn. Jan. 27, 2010) (Kyle, J.), <u>aff'd</u>, 640 F.3d 324 (8th Cir. 2011).  Factors bearing on whether a court should exercise its discretion to consider some supplemental claims but not others include "judicial economy, convenience, fairness, and comity." <u>Carnegie-Mellon Univ.</u>, 484 U.S. at 350 n.7.  Here, it makes eminent sense to exercise jurisdiction over the MHRA claims since those claims may be disposed of for the same reasons as the Title VII claims – the analysis is identical.  The remaining claims, however, require a different analysis and rely (at least in part) on different evidence. Accordingly, in the interest of fairness and comity, the Court will decline supplemental jurisdiction over them.

## CONCLUSION

The record as a whole does not suggest Jennie-O discriminated or retaliated against Pecore, or subjected her to a hostile work environment, in violation of Title VII or the MHRA.  Accordingly, and based on all of the files, records, and proceedings herein, **IT IS ORDERED** that Jennie-O's Motion for Summary Judgment (Doc. No. 27) is **GRANTED IN PART**, and Pecore's Title VII and MHRA claims (Counts I through IV of the Complaint) are **DISMISSED WITH PREJUDICE**.  The Court declines to

exercise supplemental jurisdiction over Pecore's remaining claims under the MOSHA

and MWA (Counts V and VI of the Complaint), and those claims are **DISMISSED**

**WITHOUT PREJUDICE**.

      **LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  August 11, 2014          s/Richard H. Kyle          
                                       RICHARD H. KYLE
                                       United States District Judge